**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Stull v. Summa Health Sys*, Slip Opinion No. 2024-Ohio-5718.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5718

KALVYN STULL, AN INCOMPETENT PERSON, BY AND THROUGH HIS GUARDIAN OF THE ESTATE, BRIAN ZIMMERMAN, ET AL., APPELLEES, *v.* SUMMA HEALTH SYSTEM, ET AL., APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Stull v. Summa Health Sys*, Slip Opinion No. 2024-Ohio-5718.]**

*Civil law—Discovery—Peer-review privilege—Trial court erroneously limited its own power to control discovery process when it held that factual ambiguities in affidavit testimony prevented hospital from claiming that residency file was protected by peer-review privilege—Judgment reversed and cause remanded to trial court to conduct in camera review of residency file.*

(No. 2023-0352—Submitted November 14, 2023—Decided December 10, 2024.)

APPEAL from the Court of Appeals for Summit County,

No. CA-29969, 2022-Ohio-457.

————————————

DONNELLY, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, STEWART, BRUNNER, and DETERS, JJ., joined.

**DONNELLY, J.**

{¶ 1} This case centers on a discovery dispute about a hospital's file that contains documents about a resident physician. We are asked to decide whether a "residency file" is protected by the peer-review privilege as a matter of law under R.C. 2305.252. One side claims that the file is protected based on an affidavit stating that the file is used and maintained exclusively by multiple peer-review committees. The other side claims that the file is not protected, because the affidavit contained ambiguities and did not adequately establish that the file was entirely within the scope of peer review.

{¶ 2} We hold that the presence of factual ambiguities in affidavit testimony does not alone determine whether the privilege applies as a matter of law. The Rules of Civil Procedure should be applied to resolve the factual disputes at issue in this controversy. We reverse the judgment of the Ninth District Court of Appeals and remand the cause to the trial court to conduct an in camera review of the residency file and any other appropriate factual inquiry necessary to resolve the legal question of whether the file is privileged.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} Appellees, Kalvyn Stull, along with his estate, his guardians, and family members[1] (collectively, "the Stulls") filed a medical-malpractice action against appellants, Summa Health System, its various departments and corporate

---

1. Appellees include Kalvyn Stull, an incompetent person, by and through his guardian of the estate, Brian Zimmerman, and Cynthia Stull, individually and as guardian of the person of Kalvyn Stull, an incompetent person, and David Stull, Kayla Stull, and Kyle Stull.

entities, and health professionals, including resident physician, Dr. Mazen Elashi[2] (collectively, "Summa"). The action arose from Summa's medical treatment of head injuries that Kalvyn suffered during an automobile crash. The Stulls allege that the medical treatment provided by Summa, primarily an improper intubation, deprived Kalvyn Stull of oxygen, causing cardiac arrest and additional, severe brain damage.

{¶ 4} As part of discovery, the Stulls requested Dr. Elashi's "entire resident file, including every evaluation completed for every rotation." Summa objected, contending that "this request seeks information that is privileged by peer review" and further stating that "the entire file is privileged." Later on in the discovery process, the Stulls filed a motion to compel the production of various items, including the "resident file for Dr. Elashi."

{¶ 5} In their motion to compel, the Stulls argued that the peer-review privilege did not apply to the residency file, which the Stulls maintained was different from "any peer review, credentialing, or quality assurance committee files."

{¶ 6} Summa supported its claim of privilege by providing an affidavit from Dr. Erika Laipply, the interim program director of Summa's General Surgery Residency Program. In her affidavit, Dr. Laipply explained:

> 4. Summa conducts as part of its regular business activities professional credentialing, medical resident evaluations, resident performance reviews and quality review activities involving the competence of, professional conduct of, and quality of care provided

---

2. Appellants include Summa Health System, Summa Health System Corp., Summa Health System Community, Summa Health, Summa Physicians, Inc., d.b.a. Summa Health Medical Group, Jeffrey R. Welko, M.D., Nathan R. Blecker, M.D., Mazen E. Elashi, M.D., and Lynda J. Shambaugh, R.N.

by health care providers, including physicians . . . and resident physicians.

. . .

6. . . . Summa's Graduate Medical Education Committee ("GMEC") is responsible for oversight of the quality assessment of residents and review of the care provided by residents. GMEC does this through its Medical Education Department ("Med Ed"). Med Ed is comprised of the administrative staff who administer the residency programs as agents of the GMEC. Each residency program has a residency director and faculty members who are physicians with clinical privileges at Summa and who participate in the peer review process of medical care rendered by the residents.

7. Under the umbrella of the GMEC is another group of committees which are directly responsible for the quality review of residents, and which report back to the GMEC. They are called the Clinical Competency Committee(s) ("CCC"), and there is one for each residency program. The CCC for each program is comprised of the specific residency program director, plus members of the faculty of that program. Their responsibility is to periodically gather and analyze any and all data from performance, formal or informal, and quality reviews of the individual residents, and to make recommendations to the program director and the GMEC about quality assurance, the status of the overall program, and the competence of, professional conduct of, or quality of care provided by the individual resident physicians.

8. . . . The residency file contains records of qualitative assessment by faculty members of the medical care rendered by the resident physicians, and the competence of, professional conduct of,

4

and quality of care provided by the residents. Some of the data is general review of skill and quality of care, while sometimes the data pertains to specific patients.

9. Residency Coordinators (the administrative staff) maintain the residency quality files. Access to residency files is strictly limited to only those individuals who participate in the residency review and peer review processes.

10. For the purposes of this affidavit, I am using the term "peer review committee" to mean a committee of Summa (in relation to Summa or its medical staff) either in its entirety or at such times as the committee is engaged in peer review activities.

. . .

12. This request seeks information and documentation that directly relates to quality review activities involving the competence of, professional conduct of, or quality of care provided by resident physician Dr. Elashi. Dr. Elashi's residency file is subject to the peer review processes identified above and is contained in the records of the Summa peer review committees as it relates to the competence of, professional conduct of, or quality of care provided by Dr. Elashi.

{¶ 7} The trial court held that Summa had not met its burden of establishing that the peer-review privilege applied to the disputed file. Summit C.P. No. CV-2019-06-2259, 2021 WL 1550519, *3 (Apr. 16, 2021). The trial court indicated that for Summa to meet its burden, Summa had a choice between "'(1) submitting the documents in question to the trial court for an in camera inspection, or (2) presenting affidavit or deposition testimony containing the information necessary for the trial court to adjudge whether the privilege attaches.' " *Id.* at *4, quoting

*Bansal v. Mt. Carmel Health Sys., Inc.,* 2009-Ohio-6845, ¶ 14 (10th Dist.). The trial court noted that Summa chose the latter option and had not submitted the file for an in camera inspection. Thus, based on the affidavits that Summa submitted, the trial court recognized that "information in the resident file *could* be protected by the peer review privilege. However, [Summa has] the burden to show the information actually *is* protected." (Emphasis in original.) *Id.* It held, "Dr. Laippley's affidavit contains mostly generalities and conclusionary opinions. She does not identify any specific individuals who authored documents contained in Dr. Elashi's file or specifically identify any individuals as being part of a peer review committee." *Id.* The trial court concluded that the motion to compel should be granted regarding the residency file and ordered Summa to produce the file in its entirety. *Id.* at *4, 6.

{¶ 8} Summa filed an interlocutory appeal, and the Ninth District Court of Appeals affirmed the trial court's ruling. 2022-Ohio-457 (9th Dist.). Like the trial court, the appellate court stated that in order for Summa to establish that the peer-review privilege attached to the residency file, Summa had the options of "'"'(1) submitting the documents in question to the trial court for an in camera inspection, or (2) presenting affidavit or deposition testimony containing the information necessary for the trial court to adjudge whether the privilege attaches."' "' *Id.* at ¶ 6, quoting *Meade v. Mercy Health-Regional Med. Ctr., L.L.C.*, 2019-Ohio-438, ¶ 11 (9th Dist.), quoting *Bansal* at ¶ 14.

{¶ 9} The appellate court held that Dr. Laippley's affidavit was insufficient to establish that the residency file was a record within the scope of a peer-review committee because the affidavit contained ambiguities and incomplete information. 2022-Ohio-457 at ¶ 14 (9th Dist.). For example, the appellate court determined that although the affidavit provided that "residency coordinators" maintain residency files, the affidavit did not explain if those coordinators "are part of the administrative staff of the GMEC, a CCC, or some other aspect of the hospital."

*Id.* The appellate court particularly took issue with Dr. Laipply's explanation that "residency files may be accessed by anyone who participates 'in the residency review and peer review processes.' " *Id.* at ¶ 15. Because the affidavit referred to "residency review" in addition to "peer review," the appellate court concluded that the two types of review might be different, separate processes. *Id.* The appellate court noted that the peer-review privilege must be strictly construed and concluded that the trial court correctly determined that Summa had not met its burden of establishing that the peer-review privilege applied to the residency file. *Id.* at ¶ 16.

{¶ 10} We accepted Summa's discretionary appeal to consider the following proposition of law:

> The peer review privilege set forth in R.C. 2305.252 applies to residency files that are kept and maintained by a hospital for the purpose of reviewing and evaluating the competence, professional conduct, and quality of care of resident physicians.

*See* 2023-Ohio-1665.

## II. POSITIONS OF THE PARTIES

{¶ 11} Summa asserts that by differentiating "peer review" from "residency review," the Ninth District Court of Appeals has announced that the peer-review privilege, protected by R.C. 2305.252, does not apply to resident physicians. Summa contends that a residency file is akin to a physician's credentialing file, which has been held to be protected in its entirety by the peer-review privilege, *see, e.g.*, *Cousino v. Mercy St. Vincent Med. Ctr.*, 2018-Ohio-1550 (6th Dist.); *Hammonds v. Ruf*, 2004-Ohio-6273 (9th Dist.); *Huntsman v. Aultman Hosp.*, 2008-Ohio-2554 (5th Dist.). It urges this court to hold that there is no legal distinction between residency review and peer review, that the applicability of the peer-review privilege need not be proven by identifying each individual document within a

residency file, and that the identity of the authors of particular documents is irrelevant to whether the documents in a residency file were prepared exclusively for peer review or whether the file itself is exclusively used for peer review.

{¶ 12} The Stulls contend that because Summa did not submit the resident file for in camera review—which, they argue, "would have given the trial court the ability to make an informed decision on whether portions or all of Dr. Elashi's file were in fact privileged"—Summa "force[d] the [trial court] to make a ruling without the ability to actually review Dr. Elashi's file." The Stulls assert that the courts below were left with no choice but to rely on the affidavits submitted by Summa and to grant the motion to compel based on the insufficiency of Laipply's affidavit.

{¶ 13} The Stulls urge this court to hold that Summa failed to provide sufficient evidence to support its claim that the peer-review privilege applied to Dr. Elashi's residency file. The Stulls argue that Summa failed to identify and establish that the privilege applies for each individual document in the residency file. Dr. Laipply's affidavit, the Stulls argue, states that individuals who "participate" in the peer-review process can access the residency file, but it does not specify whether those individuals access the file only for peer review purposes. The Stulls note that Summa's position would allow it to use the peer-review privilege to conceal records; the ambiguities and gaps in Dr. Laipply's affidavit, the Stulls argue, make it possible that the documents in the residency file are not limited to peer review and quality assurance.

### III. ANALYSIS

{¶ 14} We disagree with Summa that the Ninth District Court of Appeals' decision announced the legal meaning of the term "residency review." Neither the trial court nor the appellate court determined whether the residency file was or was not privileged as a matter of law. The problem identified by the lower courts was not that Dr. Laipply's affidavit described a process that did not constitute peer

8

review as a matter of law. Rather, those courts held that the peer-review privilege *might* apply to some or all of the residency file, but various ambiguities in Dr. Laipply's affidavit left the courts uncertain about whether the file was protected by the peer-review privilege as a matter of law.

{¶ 15} We disagree with the Stulls that the trial court had no choice but to determine whether the peer-review privilege applied solely by reviewing Dr. Laipply's affidavit, and that disclosure was required because of the deficiencies in the affidavit. The mere fact that affidavit testimony falls short of conclusively establishing that a file is within the scope of the peer-review privilege does not require the conclusion that the file is unprivileged, nor does it justify a blanket order to disclose the entire contents of the file. The trial court had the power to take a more active role and control the discovery process related to the peer-review privilege, and that power was not limited by the substantive law governing the peer-review privilege or by the standard set forth in *Bansal*, 2009-Ohio-6845 (10th Dist.).

**A. The relevant rule and laws**

{¶ 16} There are two sets of standards that are relevant to this dispute: the substantive laws that define and govern the peer-review privilege contained in R.C. 2305.25 through 2305.253, and the procedural rules that apply to claims of privilege in Civ.R. 26. Although we must discuss the statutory scheme to understand the context of the parties' arguments and the lower courts' reasoning, the Rules of Civil Procedure ultimately guide our disposition in this appeal.

*1. The peer-review statutory scheme*

{¶ 17} The peer-review privilege applies to "[p]roceedings and records within the scope of a peer review committee of a health care entity." R.C. 2305.252(A). A "peer review committee" is defined as:

[A] utilization review committee, quality assessment committee, performance improvement committee, tissue committee, credentialing committee, or other committee that does either of the following:

(a) Conducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care;

(b) Conducts any other attendant hearing process initiated as a result of a peer review committee's recommendations or actions.

R.C. 2305.25(E)(1). A peer-review committee can take a number of forms beyond the straightforward "peer review committee of a hospital," R.C. 2305.25(E)(2)(a). For example, a peer-review committee can also be "[a] board or committee of a hospital . . . when reviewing professional qualifications or activities of health care providers, including both individuals who provide health care and entities that provide health care." R.C. 2305.25(E)(2)(c).

{¶ 18} The type of information protected by the peer-review privilege is outlined in R.C. 2305.252. The peer-review-privilege statute prohibits, among other things, the disclosure of information "produced or presented during the proceedings of the peer review committee." R.C. 2305.252(A). The statute also prohibits the disclosure of any information or testimony provided to a peer-review committee by any "individual who testifies before a peer review committee, serves as a representative of a peer review committee, serves as a member of a peer review committee, works for or on behalf of a peer review committee, or provides information to a peer review committee." *Id*.

{¶ 19} The peer-review privilege is expansive in some respects: it applies to "information, documents, or records" that are shared among multiple peer-review committees, so long as they continue to be "used only for peer review purposes." *Id*. Further, the peer-review privilege continues to apply to the body of "information, documents, or records" within the scope of peer review even when a portion of those materials is released, and "[o]nly the information, documents, or records actually released cease to be privileged . . . ." *Id*.

{¶ 20} The peer-review privilege does not necessarily expand to everything a peer-review committee touches. The fact that an individual has participated in or provided information to a peer-review committee does not prevent that individual from "testifying as to matters within the individual's knowledge." *Id*. "Information, documents, or records otherwise available from original sources" do not become privileged "merely because they were produced or presented during proceedings of a peer review committee." *Id*. However, such "information, documents, or records are available only from the original sources and cannot be obtained from the peer review committee's proceedings or records." *Id*.

*2. The rules of discovery*

{¶ 21} The rules governing the general scope of discovery and claims of privilege in Civ.R. 26 are far less complicated and specialized than the peer-review statutory scheme. That being said, Civ.R. 26 was amended a few times during the pendency of this action, and certain changes to the rule merit additional discussion.

{¶ 22} At the time of the Stulls' November 10, 2020 motion to compel, the rule governing the general scope of discovery provided that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," Civ.R. 26(B)(1). Before July 1, 2020, parties were more broadly allowed to obtain discovery of any nonprivileged matter that was "relevant to the subject matter involved in the pending action." Former Civ.R. 26(B)(1), 22 Ohio St.2d 33 (front pages) (effective

July 1, 1970). This court changed the language of Civ.R. 26(B)(1) and other portions of Civ.R. 26 to align the rule more closely with Fed.R.Civ.P. 26. *See* 2020 Staff Note to Civ.R. 26, 157 Ohio St.3d CXXI. The changes to the rule— particularly the addition of proportionality considerations in Civ.R. 26(B)(1)— "contemplate[] greater judicial involvement in the discovery process" and "reflect[] the need for continuing and close judicial involvement in the cases that do not yield readily to the ideal of effective party management." *Id.*

{¶ 23} The rule governing the withholding of discovery based on a claim that the information sought is privileged was renumbered from Civ.R. 26(B)(6)(a) to 26(B)(8)(a) in 2020, *see* 157 Ohio St.3d at CXIX, but the wording of the rule otherwise remained the same. Civ.R. 26(B)(8)(a) requires that a claim that information sought is privileged "shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."

{¶ 24} A Committee Note to Fed.R.Civ.P. 26(b)(5)(A), which is substantially similar to Civ.R. 26(B)(8)(a), explains that the best way to sufficiently describe allegedly privileged materials will depend on the context:

> The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection. Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories.

Committee Note to Fed.R.Civ.P. 26, 146 F.R.D. 401, 639.

**{¶ 25}** Although a privilege log is often used to support claims of privilege, a log is not always necessary to establish privilege. *See State ex rel. Nix v. Cleveland*, 1998-Ohio-290, ¶ 18 ("respondents were not required to submit a 'privilege log' in order to preserve their claimed [attorney-client privilege] exemptions"); 2023 Staff Note to Civ.R. 26, 168 Ohio St.3d XCV (asserting a privilege under Civ.R. 26(B)(8) often "entails preparation of a privilege log, but that may prove burdensome and expensive.").[3]

**{¶ 26}** According to the 2023 Staff Note, a trial court's consideration of "[p]roportionality as set out in Civ.R. 26(B)(1) applies to all scope of discovery issues including the format used to assert privilege or work-product production in a log or by other appropriate means." 2023 Staff Note to Civ.R. 26, 168 Ohio St.3d XCV. In light of the "greater judicial involvement in the discovery process" contemplated in Civ.R. 26(B)(1) and made applicable to Civ.R. 26(B)(8)(a), certain privilege disputes may call for greater judicial involvement regarding the way in which a privilege claim may be proven.

### B. Discussion

**{¶ 27}** The trial court and the appellate court both cited *Bansal*, 2009-Ohio-6845 (10th Dist.)[4] to indicate that Summa had one of two methods to establish that Dr. Elashi's residency file was protected by the peer-review privilege: (1) submit the residency file for the trial court to review in camera or (2) provide adequate information in an affidavit to establish that the privilege attaches. *See* 2022-Ohio-457 at ¶ 6 (9th Dist.); Summit C.P. No. CV-2019-06-2259, 2021 WL 1550519, at

---

3. The amendments to Civ.R. 26 in 2023 did not include any changes to Civ.R. 26(B)(1) or (B)(8)(a), the wording of which remains identical to the version in effect in 2020. The 2023 Staff Note is therefore applicable to Civ.R. 26(B)(1) and (B)(8)(a) as they existed in 2020.

4. The appellate court also quoted *Meade*, 2019-Ohio-438 (9th Dist.), which merely quoted the standard articulated by the Tenth District Court of Appeals in *Bansal*. *Meade* is otherwise inapposite as it involves a failed second attempt to obtain discovery of information previously held to have been privileged. *See Meade* at ¶ 12-15, 18-21.

*4. Both courts assumed that if a party opts to submit an affidavit, and if the affidavit is lacking in any way, the party forfeits the privilege claim and must disclose the disputed material. *See* 2022-Ohio-457 at ¶ 6 (9th Dist.); Summit C.P. No. CV-2019-06-2259, 2021 WL 1550519, at *4. The appellate court further indicated that the ambiguities in Dr. Laipply's affidavit required the conclusion that the peer-review privilege did not apply, because "privileges must be strictly construed." 2022-Ohio-457 at ¶ 16 (9th Dist.). We hold that neither *Bansal* nor the strict construction of the peer-review privilege supported the trial court's decision to order Summa to disclose Dr. Elashi's residency file.

{¶ 28} The peer-review privilege was created by statute. *See* R.C. 2305.25 through 2305.253. Dr. Laipply's affidavit largely tracks the statutory language defining the peer-review privilege in R.C. 2305.25 and 2305.252, but the appellate court focused on the fact that certain details in the affidavit were "not explained" or "unclear," 2022-Ohio-457 at ¶ 14-15 (9th Dist.). A lack of clarity in this context relates to the standard that a claim of privilege "shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim," Civ.R. 26(B)(8)(a). The clarity requirement does not heighten Summa's evidentiary burden under the civil rules or force Summa into an all-or-nothing gamble.

{¶ 29} Next, the Tenth District's decision in *Bansal* does not support the notion that Summa could only support its privilege claim using one of two methods or that the trial court's consideration of the claim was similarly limited. In *Bansal*, a physician filed suit alleging discrimination and other tort-related claims arising from his removal from a hospital call list that generated patient referrals. The discovery requests that later became the subject of a motion to compel included information such as dates and methods of contact between the defendants and the physician, any meetings involving the defendants wherein the physician was discussed, and the identity of any other doctors who had been removed from the

14

call list in previous years. The defendants submitted an affidavit establishing the existence of two peer-review committees within the defendant hospital and otherwise claimed that all of the requested information was covered by the peer-review privilege. The trial court denied the motion to compel in full, concluding that all the requested documents were privileged. *Bansal* at ¶ 10. The Tenth District reversed the trial court's judgment because the affidavit failed to make a connection between certain requested information and the existence of peer-review committees. *Id*. at ¶ 18. The Tenth District remanded the cause to the trial court and suggested that the trial court should require the defendants to produce the disputed materials for in camera review, or at least properly analyze the potential connection between each item and the alleged privilege. *Id*. at ¶ 18, 20.

**{¶ 30}** Notably, the Tenth District did *not* conclude in *Bansal* that the deficiencies in the defendants' affidavit regarding the peer-review privilege required the disclosure of the contested materials. Indeed, a few decades prior, the Tenth District held that active intervention and review by the trial court is appropriate even when a claim of privilege is unsupported by an affidavit or other proof. *See Gates v. Brewer*, 2 Ohio App.3d 347 (10th Dist. 1981). In *Gates*, after holding that the trial court committed reversible error by granting a protective order based on a bald claim of privilege, the Tenth District explained:

> When a trial court is presented with a situation in which an individual attempts to avoid testimony or a party attempts to prevent the introduction of certain evidence by asserting the [peer-review privilege], it is incumbent upon the trial court to hold an *in camera* inspection of the information, documents or records in question and to question the witness as to the nature of his testimony. By virtue of the *in camera* inspection and the questioning of the witness, the

trial court then can make an informed decision as to the admissibility of the evidence and testimony in relation to [the peer-review privilege].

*Id*. at 351.

{¶ 31} This court has similarly held that "[i]n managing the progression of a case, a trial court has inherent authority to use in camera review as a tool to resolve discovery disputes." *Daher v. Cuyahoga Community College Dist.*, 2018-Ohio-4462, ¶ 12, citing *State ex rel. Grandview Hosp. & Med. Ctr. v. Gorman*, 51 Ohio St.3d 94, 95 (1990). When a privilege issue is complicated or unclear, "[a]n *in camera* inspection is only a minimal first step" in resolving the issue of privilege. *Gorman* at 96. A trial court can take the step of in camera review, and any other step allowed by the civil rules, given its inherent power to control discovery in general. *See id.* at 95; *State ex rel. Abner v. Elliott*, 1999-Ohio-199, ¶ 16 (trial courts have "extensive jurisdiction over discovery, including inherent authority to direct an *in camera* inspection of alleged privileged materials").

{¶ 32} Summa argues that in camera inspection is inappropriate here because the individual documents within the residency file will not necessarily demonstrate that the file itself is privileged, and any documents that were created in the ordinary course of business can only be obtained from their original source and not from the residency file. We disagree that these points render in camera review inappropriate. It is true that details about the creation, purpose, and use of a record, rather than the content of the record itself, indicate whether it is a "record[] within the scope of a peer review committee." R.C. 2305.252(A). But the fact that more information may be required beyond the face of a record does not render in camera review inappropriate; instead, it indicates that in camera review is only one of multiple evidentiary devices that a trial court may require in order to facilitate its determination of privilege.

## IV. CONCLUSION

{¶ 33} We conclude that the trial court erroneously limited its own power to control the discovery process and that it should conduct further inquiry, including but not limited to in camera review, to determine whether Dr. Elashi's residency file is protected by the peer-review privilege. We reverse the judgment of the Ninth District Court of Appeals and remand the cause to the trial court to conduct an in camera review of the residency file and any other appropriate factual inquiry necessary to resolve the legal question of whether the file is privileged.

Judgment reversed
and cause remanded.

_____

Plakas Mannos, Lee E. Plakas, Megan J. Frantz Oldham, Collin S. Wise, and Lauren A. Gribble; and Brian Zimmerman, for appellees.

Roetzel & Andress, L.P.A., Stephen W. Funk, Megan M. Millich, and Lindsay A. Casile, for appellants.

Flowers & Grube, Louis E. Grube, Paul W. Flowers, Kendra Davitt; and the Mellino Law Firm, L.L.C., and Calder Mellino, urging affirmance for amici curiae Ohio Association for Justice and Cleveland Academy of Trial Attorneys.

Schulman, Roth and Associates, Co., L.P.A., and Andrew R. Burton, urging affirmance for amicus curiae Stark County, Ohio Association for Justice.

Bricker Graydon L.L.P., Anne Marie Sferra and Wan Zhang, urging reversal for amici curiae American Medical Association, Ohio Hospital Association, Ohio State Medical Association, and Ohio Osteopathic Association.

_____